## HARRY STRANGE v. THE STATE.

### No. 1599. Decided November 3, 1897.

**Murder—Evidence—Declarations of Defendant—Relevancy.**

On a trial for murder, testimony that defendant had threatened to kill his own brother on the Saturday before the homicide, and, upon being remonstrated with, laughed and said, "Well, I will kill somebody before next Saturday night," was wholly irrelevant and immaterial, as the evidence in no manner connected deceased with the threats; and so, evidence to the effect that some time prior to the killing the witness and defendant were riding home from church and defendant ran his hand in his bosom, where there was a pistol, and said, "I am going to kill my wife and her protector," but named no one as the "protector," was wholly irrelevant and inadmissible where from the other testimony in the case there was no suggestion of any animosity between defendant and deceased, who were friendly up to the day of the homicide.

APPEAL from the District Court of Shelby. Tried below before Hon. TOM C. DAVIS.

Appeal from a conviction for murder in the second degree, penalty assessed being nineteen years imprisonment in the penitentiary.

A brief but very clear statement of the salient features of the case and the facts immediately attendant upon the killing will be found in the opinion. No additional statement is required.

*Wheeler, Brewer & Stephenson,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at nineteen years confinement in the penitentiary; hence this appeal.

The record shows that the homicide occurred at about nightfall on the 24th day of September, 1896, at the home of the defendant. It appears that previous to that evening the deceased and the defendant had been on friendly terms. Deceased and defendant were neighbors. On the morning of the homicide, deceased and defendant left the house of the latter in defendant's wagon, went to a gin some half a mile distant, got a bale of cotton that belonged to the deceased, and carried it to the town of Timpson, some eight or ten miles from defendant's home. At Timpson, it appears, they were joined by Laura Strange (wife of appellant), and Bell Hawkins, and her small boy, these latter having walked to Timpson. A bale of cotton belonging to deceased and Bell Hawkins was sold in Timpson, and the money divided between them. Some time in the evening all of said parties left Timpson in the wagon together; the wagon being driven by the deceased, the wife of the defendant sitting by his side. The defendant sat on a box in the middle of the wagon, and Bell Hawkins and her boy sat in the rear of the wagon.

The testimony of the State tends to show that on the return, and after they had traveled some miles, a quarrel ensued between the wife of the defendant and Bell Hawkins; there being some proof in the record that Bell Hawkins was mistress of appellant. Appellant seized an ax that was in the wagon, and started as if to strike his wife. Deceased interfered, took the ax away from him, and threw it down in the wagon. Defendant then got out of the wagon, got a gun out of the wagon, and appeared as if he was loading it. He put the gun back in the wagon, and made some threat to go and get a gun and kill deceased, and started to a house near by. Deceased and the others remained in the wagon, and started to drive on, remarking that they had no time to waste, and telling the defendant to get in the wagon and come on. He refused, and they went off and left him. The parties in the wagon proceeded on the road to the home of the deceased, which was some six miles distant. They arrived there about night, took the horses out, and put them in the lot. About half an hour after their arrival, and while the deceased was still at the wagon, defendant arrived. According to the State's testimony, he immediately asked the deceased why he did not wait for him. Deceased told defendant that he said he was going off to get a gun to kill him, as a reason for not waiting. Defendant said it was a damn lie. Deceased said he would not take it. Defendant said he would have to take it. Defendant then went into his house (which was a few steps distant), got his gun, returned with it to the fence, and then, without any provocation on the part of the deceased, shot him down.

Appellant's testimony tends to show that on the way deceased was too familiar with the wife of the defendant, and she and defendant both told deceased to let her alone. Defendant's testimony denies any difficulty between defendant and deceased on the way home, in which deceased took an ax away from defendant, or that he got out of the wagon, threatening to go and get a gun to shoot deceased. He accounts for his getting out of the wagon at that point, in order to urinate. His testi-

mony further tends to show that when he arrived at home, and when he reached the wagon, he asked his wife why they did not stop for him; that she replied that she could not do anything, with that negro driving (alluding to the deceased). Deceased then spoke up, and an altercation ensued between defendant and deceased, in which deceased threatened defendant, and advanced towards him; that defendant then went in his house, got his gun, came back, and told deceased to leave there; that deceased again threatened him, and started towards him, making a hostile demonstration; and that he then shot deceased.

We have stated the substance of the testimony, in order that the bills of exception may be presented, and the effect of the testimony admitted over appellant's objections may be more clearly seen.

Over the appellant's objections, the State was permitted to prove that on one occasion, some time before the homicide, appellant was seen carrying a gun, and on two occasions he was found armed with a pistol. The State was also permitted to show that on Sunday before the killing at Smerna Church, witness Gid Hooper had a conversation with the defendant, and that the defendant said that Lewis (meaning his brother) had treated him wrong, and that, if he ever treated him that way again, he was going to kill him. Witness told defendant that Lewis was his brother, and it was wrong for brothers to do that way. And in that connection it was also shown that defendant then laughed, and said, "Well, I will kill somebody, and that before next Saturday night." The State was also permitted to show that on one occasion, some time prior to the homicide, defendant and Phil Bussy were riding together one night in company with John Richards, deceased. They were coming from Smerna Church towards home. That he saw defendant run his hand in his bosom, and he saw a pistol, and defendant said to witness, "You told my wife something about me that caused me trouble;" and defendant then said to witness, "I am going to kill my wife and her protector." Witness stated that he did not know to whom defendant alluded as his wife's "protector." The court's explanation shows that this statement was made when defendant and the witness were together alone, and after they had passed the house of John Richards. Now, all this testimony was objected to on the grounds stated in the bills of exception, but was admitted by the court over appellant's objection. It is shown by bill of exceptions number 6 that the court, at the time said testimony was offered by the State, admitted said evidence upon the statement of counsel for the State that they expected to show the materiality of the said testimony before the State closed. After the State closed, and before appellant introduced any evidence, he asked that all of said testimony be excluded on the ground that the same was irrelevant and immaterial, and was not connected with the case, and could only serve to prejudice the defendant before the jury.

As before stated, we set out the substance of the testimony, which presents the theory of both the State and appellant. There is no suggestion in the evidence of any prior animosity existing between defendant and de-

ceased. They appear to have been friendly up to the day of the homicide, and the killing, if malicious, must have been engendered on that day. There were no prior quarrels, threats, or altercations between the parties. They appear to have had a sudden falling out on the way home from Timpson, and, in the light of the facts of the case, we utterly fail to see how the fact that the defendant on one occasion may have had a gun, and on two other occasions may have been found carrying a pistol, could serve to shed any light upon this killing. Not being connected with any fact or circumstance having a bearing upon the homicide, it could serve no other purpose than to create the impression in the minds of the jury that the defendant was a bad and reckless man, and in the habit of carrying pistols. And, in regard to the threat made by defendant against his brother Lewis, it is absolutely unconnected with any fact or circumstance shedding any light upon this case; and in that connection the fact that he "laughed, and said he would kill somebody before Saturday night," could have no significance as tending to make a solution of any act of defendant that was relevant and provable in the case. There is no pretense that he referred to the deceased, but they were then on friendly terms. The same observations may be made with reference to the testimony of the witness Bussy that on one occasion defendant said that he would kill his wife and her protector. The evidence fails to show any improper relations between appellant's wife and deceased—in fact, no act of impropriety—prior to the date of the homicide, and nothing suggesting any improper relations between them. The testimony was not connected with the case, yet it was of such a character as might be used by the jury to prejudice their minds against appellant—that he was such a vicious man as to threaten the life of his brother, and even of his wife. It might serve to either increase the degree of the crime in their minds, or to enhance the punishment of appellant. It could not prove otherwise than hurtful to the appellant, and, being irrelevant and unconnected with any fact proved in the case, it should not have been admitted.

For the error of the court in admitting this testimony, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Hurt, Presiding Judge, absent.